**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| REBECCA LEONARD, et al. | : | |
| | : | CIVIL ACTION |
| Plaintiffs | : | |
| v. | : | |
| | : | NO. 11-7418 |
| BEVERLY MACKERETH, in her official | : | |
| capacity as Secretary of Public Welfare | : | |
| for the Commonwealth of Pennsylvania | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                        February 10, 2014

     Pending before the Court are the Motion for Summary Judgment by Defendant Beverly

Mackereth in her official capacity as Secretary of Public Welfare for the Commonwealth of

Pennsylvania and the Motion for Summary Judgment by Plaintiffs.  For the following reasons,

Defendant's Motion for Summary Judgment is granted in part and denied in part and Plaintiffs'

Motion for Summary Judgment is granted in part and denied in part.

## I.      FACTUAL AND PROCEDURAL HISTORY[1]

     Plaintiffs are six individuals residing in Pennsylvania. (Am. Compl. ¶¶ 7–12.)  Plaintiffs

Rebecca Leonard, Matthew Leonard, Michael Unger, Michael Boss, and Elisha Rothman

(collectively "the Phoenixville Plaintiffs") each reside in Phoenixville in Chester County,

Pennsylvania.  (Id.)  Plaintiff Kimberly Hoffman ("Hoffman") resides in Royersford in

Montgomery County, Pennsylvania.  (Id.)  Defendant Beverly Mackereth is the Secretary of

Public Welfare for the Commonwealth of Pennsylvania ( "DPW").  (Def.'s Answer to Am.

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence
submitted in conjunction with those briefs. To the extent the parties allege a fact that is
unsupported by evidence, the Court does not include it in the recitation of facts.

Compl. ¶ 13.)

A.      **Pennsylvania's Medical Assistance Program**

Pennsylvania is a participating state in the federal government's Medical Assistance

Program, in which the federal government reimburses participating states for roughly half the

cost of paying for health care services to qualifying low-income individuals.  (Pls.' Mot. Summ.

J., Ex. 1, Deposition of Pamela Cain Kuhno ("Kuhno Dep."), Jul. 27, 2012, 15:16–16:22.)   As

part of the federal government's requirements for participating states, Pennsylvania has adopted a

State Plan that outlines the nature and scope of how its Medical Assistance Program will be run

and ensure that it complies with Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*

("the Medicaid Act").  (Am. Compl. ¶ 18; Def.'s Answer ¶ 18.)  Pennsylvania administers its

State Plan through the Department of Public Welfare ("DPW").  ( Pls.' Mot. Summ. J., Ex. 5,

Def.'s Resp. to Req. for Admis. ¶ 1.)

Included in Pennsylvania's State Plan is Medical Assistance for "Intermediate Care

Facilities for Other Related Conditions" ("ICF/ORC").  (Kuhno Dep. 12:20–14:3.)  An "other

related condition" is a severe, chronic disability closely related to an intellectual disability.   42

C.F.R. § 435.1010.[2]  Autism is an "other related condition."  (Pls.' Mot. Summ. J., Ex. 6, Centers

---

[2] Under 42 C.F.R. § 435.1010:

Persons with related conditions means individuals who have a severe, chronic disability that
meets all of the following conditions:

(a) It is attributable to . . . [a]ny other condition, other than mental illness, found to
be closely related to Intellectual Disability because this condition results in impairment of general
intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and
requires treatment or services similar to those required for these persons.

(b) It is manifested before the person reaches age 22.

(c) It is likely to continue indefinitely.

(d) It results in substantial functional limitations in three or more of the following
areas of major life activity:

for Medicare and Medicaid Services, State Medicaid Manual § 4398.)

ICF/ORC facilities serve as a residence for individuals with "other related conditions" where they receive active, round-the-clock treatment.  (Kuhno Dep. 24:16–25:2, 30:7–13.) ICF/ORC facilities are generally operated by private providers and are subject to state and federal regulations under 42 C.F.R. § 483.400 *et seq*. and 55 Pa.C.S. § 6600.  (Def.'s Mot. Summ. J., Ex. 3, Dep. of Kathleen Deans ("Deans Dep."), Aug. 1, 2013, 17:4–16.)  For an ICF/ORC to legally operate in Pennsylvania, it must receive certification from the Pennsylvania Department of Health.  (Deans Dep. 53:10–23.)  Presently, there are only two certified ICF/ORC facilities operating in Pennsylvania:  Erie Independence House is located in Erie with a capacity of six residents, and Verland House is located in Allegheny County with a capacity of eight residents. (Id. at 87:16–88:3.)  Both Erie Independence House and Verland House are currently operating at capacity.  (Pls.' Mot. Summ. J., Ex. 41, Def.'s Objections and Resp. to Pls.' Sec. Set of Interrog. ¶ 2.)

Pennsylvania's State Plan also includes Medical Assistance for home and community-based services ("HCBS").  (Id. at 75:19–23.)  One way individuals receive HCBS through Pennsylvania's State Plan is by applying for and obtaining an "OBRA Waiver," which are

---

(1) Self-care.
(2) Understanding and use of language.
(3) Learning.
(4) Mobility.
(5) Self-direction.
(6) Capacity for independent living.

Id.

specifically for adults with developmental disabilities.[3]  (Pls.' Mot. Summ. J., Ex. 11, OBRA

Waiver at 4.)  In order to be eligible for an OBRA Waiver, they must meet the same requirements

as for ICF/ORC services.  (OBRA Waiver 3–4; Kuhno Dep. 76:25–77:3.)  One of the services

available under the OBRA Waiver is "Community Integration," which is one-on-one treatment to

help individuals learn and improve skills in self-help, communication, socialization, and adaptive

living.  (OBRA Waiver at 76.)

      **B.**      **Plaintiffs' Treatment Under Pennsylvania's Medical Assistance Program**

      Plaintiffs are all adults who have autism and are residing at home with their parents.

(Am. Compl. ¶¶ 7–13; Pls.' Mot. Summ. J., Ex. 4, Pls.' First Set of Req. for Admis. and Def.'s

Resp. ("First Req. for Admis.")  ¶ 6; Id. Ex. 24, Hoffman Decl. ¶ 4.)  Plaintiffs' autism

manifested during childhood, is likely to continue indefinitely, and results in substantial

functional limitations in major life activities.  (First Req. for Admis. ¶ 6.)  Plaintiffs are all

categorically needy recipients of Medical Assistance under the Pennsylvania State Plan.  (Pls.'

Mot. Summ. J, Ex. 17, Stipulations ¶ 5.)  Plaintiffs have each been enrolled in the OBRA Waiver

for at least the last ten years.  (Am. Compl. and Def.'s Answer ¶¶ 44, 46, 63, 66.)

      Until April 1, 2012, DPW paid for the Phoenixville Plaintiffs to receive roughly 100

hours per week of Community Integration therapy through their enrollment in the OBRA Waiver.

---

[3] The OBRA (Omnibus Budget and Reconciliation Act) Waiver is a Pennsylvania
program administered by DPW's Office of Long-Term Living and approved by the federal
Department Health & Human Services by which Pennsylvania "provide[s] home and community-
based services to eligible individuals who, but for the provision of such services, would require"
hospitalization, nursing home care, or admission to an intermediate care facility for the mentally
retarded.  (OBRA Waiver at 3.)  By approving the OBRA Waiver, the Department of Health &
Human Services has waived certain statutory requirements of Pennsylvania's State Plan for
Medical Assistance under the Medicaid Act.  42 U.S.C. 1396n(c).

(Pls.' Mot. Summ. J., Ex. 18, Decl. of Terrence McNelis ("McNelis Decl.") ¶ 7.)  The Phoenixville Plaintiffs receive their Community Integration therapy from private provider NHS Human Services ("NHS").  (Id.)  Sometime before December 1, 2011, the Phoenixville Plaintiffs learned that DPW was preparing to make cuts to their benefits under the OBRA Waiver effective January 1, 2012.  (Compl. ¶ 3.)  Specifically, DPW had decided to cap its funding of Community Integration therapy at twelve hours per week.  (Id. ¶ 50.)

Plaintiffs filed suit on December 1, 2011 against DPW.  (Compl.)  As a result of the present litigation, DPW postponed the enactment of its changes to the OBRA Waiver by four months and raised the cap for Community Integration therapy from twelve to twenty-one hours per week.  (Pls.' Mot. Summ. J., Ex. 10, Dep of. Virginia Dawn Rogers, ("Rogers Dep.") Jul. 10, 2013, 87:10–88:2.)  Despite the overall reduction in DPW funding for the Phoenixville Plaintiffs' therapy, NHS has continued to provide the Phoenixville Plaintiffs approximately 100 hours per week of Community Integration therapy, though it has done so at a loss of $120,000 as of July 15, 2013.  (Pls.' Mot. Summ. J., Ex. 21, Dep. of Terrence McNelis ("McNelis Dep."), Jul. 15, 2013, 44:11–45:19.)

Until April 2013, Plaintiff Hoffman received her OBRA Waiver treatment from private provider Co-Op Provider.  (Pls.' Mot. Summ. J., Ex. 29, Letter from Cathryn Stein ("Stein Letter").)  Since June 2012, DPW has authorized Plaintiff Hoffman to receive round-the-clock OBRA Waiver services.  (Pls.' Mot. Summ. J., Ex. 27, Dep. of Claire Hoffman ("Hoffman July 2012 Dep."), Jul. 26, 2012, 39:11–24.)  On April 10, 2013, Hoffman received a letter from Co-Op Provider stating that it would no longer be providing services to her because it was "unable to staff the [DPW-]authorized services" including "Community Integration."  (Stein Letter.)  As of

June 11, 2013, Hoffman's parents paid out-of-pocket to continue Hoffman's Community

Integration therapy for eight-to-twelve hours per wek.  (Pls.' Mot. Summ. J., Ex. 26, Dep. of

Claire Hoffman ("Hoffman June 2012 Dep.") Jun. 11, 2013, 55:3–57:3.)

     **C.**     **Plaintiffs' Request for Placement in an Intermediate Care Facility for Other Related Conditions ("ICF/ORC")**

When the Phoenixville Plaintiffs learned of DPW's planned reduction in hours for

Community Integration services, they requested, through their parents, that DPW allow them to

enroll in ICF/ORC services.  (Rogers Dep. 106:16–18.)  Similarly, when Hoffman's behavior

began to change and she expressed a desire to live away from her family, Hoffman's parents

requested to DPW that Hoffman be able to enroll in ICF/ORC services.[4]  (Hoffman Dep.

7:24–8:24.)  Plaintiffs are each eligible to receive ICF/ORC services under the Pennsylvania

State Plan.[5]  (Kuhno Dep. 159:14–18; Dep. of Fred Lokuta ("Lokuta Dep."), Jul. 12, 2013

76:9–22.)

In February 2012, after Plaintiffs had commenced the present litigation, NHS, the private

provider for the Phoenixville Plaintiffs' OBRA Waiver services, contacted DPW about the

possibility of developing a new ICF/ORC facility.  (Pls.' Mot. Summ. J., Ex. 47, McNelis-Kuhno

E-Mail Correspondence.)  DPW responded that "the existing ICF/ORC programs were started as

pilot projects" in the mid-1990s and that "[t]he Department currently has no plans to expand that

---

     [4] Plaintiffs made the request to DPW through their respective "DPW coordinators." DPW coordinators are individuals who are responsible for the monitoring and administration of OBRA Waiver services.  (Rogers Dep. 35:14–36:10.)

     [5] See DPW's Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 10 ("DPW has thus acknowledged that these plaintiffs meet the essential requirements for *eligibility* of ICF/ORC services.") (emphasis in original)).

program.  Beyond that barrier, there are no funds available in this fiscal year, or next fiscal year

(12-13) to develop a 5 bed home. Sorry."  (Id.)  Nevertheless, DPW provided Plaintiffs, through

their counsel, a list of specific steps necessary to develop a new ICF/ORC facility and a list of

DPW contacts for licensing and budget questions.  (Def.'s Mot. Summ. J., Ex. 15, Wolson-Darr

E-mail Correspondence.)

> **D.     Additional Procedural History**

Following the initiation of the case in December 2011 and some additional motion

practice, Plaintiffs filed an Amended Complaint on June 6, 2012.   This Amended Complaint

bring four counts against DPW:[6]  Count I alleges violations of 42 U.S.C. §§  1396a(a)(10)(A)

and 1983 for failing to ensure access to ICF/ORC services; Count II claims violations of  42

U.S.C. §§  1396a(a)(8) and 1983 for causing delay in the ability of Plaintiffs to timely access

ICF/ORC services; Count III asserts violations of 42 U.S.C. §§  1396a(a)(10)(B) and 1983 for

precluding Plaintiffs from accessing ICF/ORC services comparable to the access afforded other

Medical Assistance beneficiaries; Count IV puts forth violations of 42 U.S.C. §§ 1396n(c)(2)(C)

and 1983 for failing to provide Defendants a choice between OBRA Waiver services and

ICF/ORC services.  For their relief, Plaintiffs request that: the Court retain jurisdiction over this

action; declare that DPW's actions and inactions violate the Medicaid Act and 42 U.S.C. § 1983;

issue appropriate injunctive relief to enjoin DPW from making continued violations; and issue

other relief as may be just, equitable, and appropriate.

---

[6] At the time Plaintiffs filed their Amended Complaint, Gary Alexander was the Secretary of Public Welfare for the Commonwealth of Pennsylvania and the named Defendant in this case. In their Motions, parties now name current Secretary of Public Welfare Beverly Mackereth as Defendant.

Both Plaintiffs and Defendant filed their respective Motions for Summary Judgment on October 11, 2013.  Plaintiffs and Defendant filed their Responses in Opposition to each other's Motions on November 8, 2013.  Plaintiffs and Defendant each filed Replies to the respective Responses in Opposition on November 22, 2013.  The Motions are now ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine

issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

Notably, "[t]he rule is no different where there are cross-motions for summary judgment." Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.  DISCUSSION

### A.  Federal Requirements for State Medical Assistance Plans and the Changing Definition of "Medical Assistance"

Under 42 U.S.C. § 1396a(a)(10)(a), "[a] state plan for medical assistance must provide . . . for making medical assistance available [for described services] to" all individuals who meet certain eligibility requirements. 42 U.S.C. § 1396a(a)(10)(a). States must provide medical

assistance "with reasonable promptness to all eligible individuals," and must not be "less in amount, duration, or scope than the medical assistance made available to any other" beneficiary under the plan.  42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(B).  Moreover, "individuals who are determined to be likely to require the level of care provided in a[n] . . . intermediate care facility for the mentally retarded [must be] informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of . . . an intermediate care facility for the mentally retarded."  42 U.S.C. § 1396n(c)(2)(C).

In enacting the statutes governing the requirements for state medical assistance plans under the Medicaid Act, "Congress clearly and unambiguously conferred the rights" to those required services to individuals entitled to receive such benefits and "[did] not preclud[e] individual enforcement of those rights."  Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 194 (3d Cir. 2004).  Individuals entitled to benefits may enforce their rights under the Medicaid Act through a civil rights claim brought under 42 U.S.C. § 1983.  Id.

Third Circuit jurisprudence has been clear about whether and how qualified individuals could enforce the provisions for "medical assistance" enumerated under the Medicaid Act. However, it has been less clear on the question of what a state is actually required to provide when the Medicaid Act requires it to provide "medical assistance."

### 1.   Prior Circuit Split on the Definition of "Medical Assistance"

Until recently, where the Medicaid Act referred to "medical assistance," it meant that states were responsible for providing "payment of part or all of the cost of" services.  42 U.S.C. 1396d(a) (2009).  To that end, some federal courts of appeal held that the definition of "medical assistance" under § 1396d(a) limited a state's obligation to providing financial assistance only.

See Bruggeman ex rel. Bruggeman v. Blagojevich, 324 F.3d 906, 910 (7th Cir. 2003) ("[T]he statutory reference to 'assistance' appears to have reference to *financial* assistance rather than to actual medical *services*[.]" (emphasis in original)); Westside Mothers v. Olszewski, 454 F.3d 532, 540 (6th Cir. 2006) ("[W]e do not believe §§ 1396a(a)(8), 1396a(a)(10) require the State to provide medical services directly.  The most reasonable interpretation of § 1396a(a)(8) is that all eligible individuals should have the opportunity to apply for medical assistance, i.e., financial assistance[.]"); Mandy R. ex rel. Mr. and Mrs. R. v. Owens, 464 F.3d 1139, 1146 (10th Cir. 2006) ("[T]he Medicaid statute does not require states to be service-providers of last resort. . . . The State must pay for medical services, but it need not provide them.").[7]

Yet, other federal courts of appeal appeared to hold that a state's obligation under the Medicaid Act went beyond mere payment of financial assistance.  See Bryson v. Shumway, 308 F.3d, 79, 88–89 (1st Cir. 2002) (holding that there was a valid cause of action where plaintiffs sought to require the State of New Hampshire to provide more slots in its state waiver plan); Doe v. Chiles, 136 F.3d 709, 718–19 (11th Cir. 1998) (holding that there was a valid cause of action where plaintiffs sought to require the State of Florida to admit them into an intermediate care facility for the mentally retarded with reasonable promptness).

Notably, the Third Circuit expressly declined to resolve the question of whether the Medicaid Act required a state to provide more than payment of financial assistance.  Sabree, 367

---

[7] See also Clark v. Richman, 339 F. Supp. 2d 631, 641 (M.D. Pa. 2004) ("The most reasonable interpretation of § 1396a(a)(10)(A) is that medical assistance, i.e., financial assistance, must be provided for *at least* the care and services listed[.] . . .  To read the provision any other way would mean that the definition of medical assistance would be expanded, for purposes of § 1396a(a)(10)(A) only, beyond mere financial assistance and would oblige states to directly provide services as well, which would run contrary to the entire scheme envisioned under Title XIX." (emphasis in original)).

F.3d at 181 n.1 ("There appears to be a disagreement among our sister courts of appeals as to whether, pursuant to Medicaid, a state must merely provide financial assistance to obtain covered services, or provide the services themselves. . . . The only issue before us, however, is whether plaintiffs may sue Pennsylvania under 42 U.S.C. § 1983 to obtain the 'assistance' for which they qualify.  To resolve this issue we need not, and do not, address the remedy that might be available to plaintiffs[.]")  However, the Third Circuit did once go so far as to state, in dicta, that "Sabree dealt with what are essentially financial benefits."  Newark Parents Ass'n v. Newark Pub. Sch., 547 F.3d 199, 211 (3d Cir. 2008).

### 2.    Congress Enacts New Definition of "Medical Assistance"

As part of its enactment Patient Protection and Affordable Care Act, Congress amended the definition of "medical assistance" under 42 U.S.C. § 1396d(a).  As of March 23, 2010, "[t]he term 'medical assistance' means payment of part or all of the cost of the following care and services *or the care and services themselves, or both*[.]"  42 U.S.C. § 1396d(a) (2013) (emphasis added).  As one court has already noted, it appears that Congress intended to squarely address the circuit split and "to clarify that where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them[.]"  John B. v. Emkes, 852 F. Supp. 2d 944, 951 (M.D. Tenn. 2012).  Particularly edifying is the House Committee Report on the amendment which states, in relevant part:

> ["Medical assistance"] is expressly defined to refer to payment but has generally been understood to refer to both the funds provided to pay for care and services and to the care and services themselves. . . . Some recent court opinions have, however, questioned the longstanding practice of using the term "medical assistance" to refer to both the payment for services and the provision of the services themselves.  These opinions have read the term to refer only to payment; this reading makes some aspects of the rest of Title XIX

difficult and, in at least one case, absurd. If the term meant only payments, the statutory requirement that medical assistance be furnished with reasonable promptness "to all eligible individuals" in a system in which virtually no beneficiaries receive direct payments from the state or federal governments would be nearly incomprehensible. . . . To correct any misunderstandings as to the meaning of the term, and to avoid additional litigation, the bill would . . . conform this definition to the longstanding administrative use and understanding of the term.

H.R.Rep. No. 111-299, pt. 1 at 649–50.

Only a handful of federal courts have analyzed this new statutory definition of "medical assistance." Thus far, the only decision from within the Third Circuit that appears to deal directly with this new language comes from the District of New Jersey in Disability Rights New Jersey, Inc. v. Velez. No. Civ.A.05-4723, 2010 WL 5055820 (D.N.J. Dec. 2, 2010). In that case, the court had already granted summary judgment to the State of New Jersey and its Commissioner of the Department of Human Services. Velez, 2010 WL 5055820 at *1. The Court reached its initial ruling by relying on the Third Circuit's statement in Newark Parents Association that Sabree "deal[t] with what are essentially financial benefits." Id. The Court interpreted the Third Circuit's comment on Sabree in Newark Parents Association to mean that the Third Circuit had adopted the position that "medical assistance" under the Medicaid Act meant only financial assistance. Id. (citing Newark Parents Ass'n, 547 F.3d at 211). However, upon plaintiffs' filing of a motion for reconsideration, the court examined both the new statutory definition of "medical assistance" under 42 U.S.C. § 1396d(a) and the legislative history surrounding the amendment. Id. at *3. It concluded that "'medical assistance' includes not only financial assistance but also actual care or services," and therefore reinstated plaintiffs' claim. Id. at *3–4.

13

B.     "Medical Assistance" and the Present Case

Turning to the present case and Plaintiffs' Motion,[8] Plaintiffs argue that they are entitled to summary judgment because DPW's failure to ensure or provide ICF/ORC services to them violates the Medicaid Act.  Specifically, they allege that DPW has failed in "making medical assistance available to all [eligible] individuals" under 42 U.S.C. § 1396a(a)(10)(A), ensuring medical assistance is "furnished with reasonable promptness to all eligible individuals" under 42 U.S.C. § 1396a(a)(8) ("reasonable promptness requirement"), ensuring that the benefits available to Plaintiffs are not "less in amount, duration, or scope than the medical assistance made available to any other" eligible individual under 42 U.S.C. § 1396a(a)(10)(B) ("comparability requirement"), and "inform[ing] Plaintiffs of the feasible alternatives, if available under the waiver, at the choice of [Plaintiffs]" under 42 U.S.C. § 1396n(c)(2)(C) ("freedom of choice requirement").

In its Response, DPW argues that Plaintiffs are not entitled to summary judgment because, *inter alia*, the Medicaid Act does not require DPW to ensure access to or choice of ICF/ORC services.  (Def.'s Resp. in Opp'n to Pls.' Mot. Summ J. 19.)  In support of its argument, DPW relies in large part on the Tenth Circuit case of Mandy R. ex rel. Mr. and Mrs. R v. Owens, 464 F.3d 1139 (10th Cir. 2006).  In Mandy R., plaintiffs were developmentally disabled individuals who were on a long waiting list for admission into an Intermediate Care Facility for the Mentally Retarded ("ICF/MR").  Mandy R., 464 F.3d at 1140–41.  Plaintiffs sued the State of Colorado under the Medicaid Act for failing to provide ICF/MR services.  Id.  In that

---

[8]Although the Court separately addresses both Motions for Summary Judgment, it will consider the arguments raised in Plaintiffs' Motion and accompanying briefs when ruling on Defendant's Motion, and vice versa.

case, the Tenth Circuit expressly adopted the position that "the Medicaid statute does not require states to be service-providers of last resort" and read the definition of "medical assistance" under 42 U.S.C. § 1396d(a) to mean that a state "must pay for medical services, but it need not provide them." Id. at 1146.

It is true that there are many factual parallels between Mandy R. and the present case. Both cases were brought by developmentally disabled individuals seeking to compel a state to provide them Intermediate Care Facility services under the Medicaid Act. Id. at 1140–41. However, the key distinction between Mandy R. and the present case is that it was decided in 2006, when the Tenth Circuit reached its decision by analyzing the old definition of "medical assistance" under 42 U.S.C. § 1396d(a). Id. at 1143.[9]

Since Mandy R., not only has Congress amended the definition of "medical assistance" under 42 U.S.C. § 1396d(a) to include "payment of part or all of the cost of . . . care and services *or the care and services themselves, or both,*" but there is also legislative history to strongly suggest that Congress enacted this amendment to address "recent court opinions" that "questioned the longstanding practice of using the term 'medical assistance' to refer to both the payment for services and the provision of the services themselves." H.R.Rep. No. 111-299, pt. 1 at 649 (emphasis added). As such, Congress has abrogated Mandy R.'s analysis as it pertains to what the Medicaid Act requires, rendering it inapplicable to the present case. While the full extent of a state's responsibility for providing "payment of part or all of the cost of . . . care and

---

[9] "The Medicaid Act defines 'medical assistance' as 'payment of part or all of the cost of the [described] care and services.' 42 U.S.C. § 1396d(a). The statutory definition mentions payment for, but not provision of, services. In other words, 'the statutory reference to 'assistance' appears to have reference to financial assistance rather than to actual medical services.'" Id. at 1143 (quoting Bruggeman, 324 F.3d at 910).

services or the care and services themselves, or both" remains unclear, what is clear is that Congress intended to amend the definition of "medical assistance" to include actual medical services. Accordingly, the Court cannot deny summary judgment to Plaintiffs on grounds that the Medicaid Act does not require DPW to ensure access to or choice of ICF/ORC services.

It is undisputed that, to date, DPW has neither provided nor ensured the provision of ICF/ORC services to Plaintiffs as 42 U.S.C. § 1396a(a)(10)(A) requires, let alone with "reasonable promptness" as 42 U.S.C. § 1396a(a)(8) requires. It is also undisputed that there are Medicaid beneficiaries currently receiving ICF/ORC services in the two ICF/ORC facilities operating in Pennsylvania, and therefore DPW has not provided or ensured the provision of medical assistance not "less in amount, duration, or scope than the medical assistance made available to any other" eligible individual as 42 U.S.C. § 1396a(a)(10)(B) requires. It is further undisputed that Plaintiffs cannot actually choose to switch from home-based OBRA Waiver services to institutional-based ICF/ORC services, and therefore do not have "freedom of choice" under 42 U.S.C. § 1396n(c)(2)(C).[10] As the Third Circuit has held, where Congress required states accepting Medicaid funding to provide certain services to the developmentally disabled, "Congress conferred specific entitlements on individuals in terms that could not be clearer" and are therefore individually enforceable in an action brought under 42 U.S.C. § 1983. Sabree, 367 F.3d at 190. Accordingly, the Court must deny DPW's Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment as to DPW's liability under the Medicaid Act and 42

---

[10] See Zatuchni v. Richman, No. Civ.A.07-4600, 2008 WL 3408554, at *1, *10 (E.D. Pa. Aug. 12, 2008) (holding that DPW's alleged failure to ensure plaintiff's access ICF/MR services would violate the "freedom of choice" provision of the Medicaid Act under 42 U.S.C. § 1396n(c)(2)(C)).

U.S.C. § 1983 for failing to provide or ensure provision of ICF/ORC services to Plaintiffs.

**C.    Relief**

The Court's inquiry does not end with the question of liability and must consider Plaintiffs' Motion as to the relief Plaintiffs have requested.  In their Amended Complaint, Plaintiffs demand that: the Court retain jurisdiction over this action, declare that DPW's actions and inactions violate 42 U.S.C. § 1983 and the Medicaid Act; issue "appropriate injunctive relief to enjoin DPW from making continued violations"; and issue "other relief as may be just, equitable, and appropriate."  (Am. Compl. ¶ 102.)  The Court reads these demands to mean that Plaintiffs are requesting that the Court both enter a declaratory judgment against DPW under the federal Declaratory Judgment Act (28 U.S.C. § 2201) and enter an injunction against DPW under Rule 65 of the Federal Rules of Civil Procedure.  The Court will address these requests separately.

**1.    Declaratory Relief**

Defendant seeks a declaratory judgment that "Defendant's actions and inactions violate 42 U.S.C. § 1983 and Title XIX of the Social Security Act[.]"  (Am. Compl. ¶ 102.)  Under the federal Declaratory Judgment Act:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  The Third Circuit has instructed that when deciding whether to grant a declaratory judgment under this Act, the court should consider:  "(1) the likelihood that the

declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies."  Terra Nova. Ins. Co. v. 900 Bar, Inc., 887 F.2d 1213, 1224–25 (3d Cir. 1989) (quoting Interdynamics, Inc. v. Wolf, 698 F.2d 157, 167 (3d Cir. 1982) (internal citation omitted)).

Here, the Court notes that the first factor— "the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy"—has particular bearing on this case.  Were the Court to enter a declaratory judgment that "Defendant's actions and inactions violate 42 U.S.C. § 1983 and Title XIX of the Social Security Act" as Plaintiffs have requested in their Amended Complaint, such a declaration would do little to resolve the uncertainty of DPW's obligation to the Plaintiffs.  It remains unclear, under both the ambiguous "medical assistance" language of the Medicaid Act and the facts of this case, what exactly DPW is obligated to do in order to meet its statutory requirement to provide or ensure the provision of "payment of part or all of the cost of . . . care and services or the care and services themselves, or both."  42 U.S.C. 1396d(a).  It is particularly unclear under the new definition of "medical assistance" whether or how DPW should engage a private party to provide the ICF/ORC services owed to Plaintiffs or, failing that, whether the new "medical assistance" language has now made DPW a "service-provide[r] of last resort."  Mandy R., 464 F.3d at 1146.  A simple declaratory judgment that DPW is in violation of 42 U.S.C. § 1983 and the Medicaid Act would not resolve these critical questions of DPW's responsibility under the new law.  Accordingly, the Court will deny Plaintiffs' Motion for declaratory relief and grant DPW's Motion as to the requested declaratory relief.

18

### 2.     Injunctive Relief

Plaintiffs seek injunctive relief "to enjoin Defendant from continuing to violate 42 U.S.C.

§ 1983 and Title XIX of the Social Security Act and to take appropriate steps to remedy their

violations."  (Am. Compl. ¶ 102.)  Plaintiffs also request that the Court "issue such other relief as

may be just, equitable, and appropriate, including an award of reasonable attorneys' fees,

litigation expenses, and costs pursuant to 42 U.S.C. § 1988."  (Id.)

"A court may issue a permanent injunction where the moving party has demonstrated

that: (1) the exercise of jurisdiction is appropriate; (2) the moving party has actually succeeded

on the merits of its claim; and (3) the 'balance of equities' favors granting injunctive relief."

Chao v. Rothermel, 327 F.3d 223, 228 (3d Cir. 2003) (citing Ciba–Geigy Corp. v. Bolar Pharm.

Co., 747 F.2d 844 (3d Cir. 1984)).  Under Rule 65(d)(1) of the Federal Rules of Civil Procedure,

"[e]very order granting an injunction . . . must: (A) state the reasons why it was issued; (B) state

its terms specifically; and (C) describe in reasonable detail— and not by referring to the

complaint or other document— the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).

An injunction should be "no broader than necessary to provide full relief to the aggrieved

plaintiff."  McLendon v. Cont'l Can Co., 908 F.2d 1171, 1182 (3d Cir. 1990).  As the Supreme

Court has explained, the policy behind this principle is "to prevent uncertainty and confusion on

the part of those faced with injunctive orders, and to avoid the possible founding of a contempt

citation on a decree too vague to be understood."  Schmidt v. Lessard, 414 U.S. 473, 476 (1974).

Moreover, under Rule 65(d)(2), any order issuing an injunction can bind only "(A) the

parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other

persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or

19

(B)."  Fed. R. Civ. P. 65(d)(2).   To that end, "persons who are not actual parties to the action or in privity with any of them may not be brought within the effect of a decree merely by naming them in the order."  <u>Savarese v. Agriss</u>, 883 F.2d 1194, 1209 (3d Cir. 1989) (citation omitted).[11]

Plaintiffs argue that the Court can issue injunctive relief at this stage in the litigation without running afoul of Rule 65(d).  (Pls.' Resp in Opp'n to Def.'s Mot. Summ. J. 19.) Plaintiffs cite the case of <u>Morgan v. Cohen</u> in support of the notion that the Court should issue an injunction to ensure that Plaintiffs in this case receive ICF/ORC benefits.  665 F. Supp. 1164 (E.D. Pa. 1987).  In <u>Morgan</u>, the court granted injunctive relief to a class of plaintiffs "eligible to attend psychiatric partial hospitalization services subsidized by the medical assistance (Medicaid) program under Title XIX of the Social Security Act[.]"  <u>Morgan</u>, 665 F. Supp. at 1165. Plaintiffs, however, are incorrect in their assertion that the injunction in <u>Morgan</u> "required DPW to enter into contracts with particular providers that required them to assure that recipients received transportation to their services[.]"  (Pls.' Resp. in Opp'n to Def.'s Mot. Summ J. 19.) Rather, the injunction in <u>Morgan</u> stated that DPW was "enjoined from requiring any provider of psychiatric partial hospitalization service . . . to enter into a contract whereby the provider would assure transportation to members of the plaintiff class in exchange for an increase in the hourly rate of payment for therapy."  <u>Id.</u> at 1180.  In other words, the court in <u>Morgan</u> enjoined DPW from entering into certain kinds of contracts, and did not require DPW to affirmatively enter into certain kinds of contracts.  As such, Plaintiffs' analogy between the relief granted in <u>Morgan</u> and

---

[11] "[T]he only significant exception to this rule involves nonparties who have actual notice of an injunction and are guilty of aiding or abetting or acting in concert with a named defendant or his privy in violating the injunction. They may be held in contempt." <u>Savarese</u>, 883 F.2d at 1209 (citation omitted).

the relief they seek in the present case is inaccurate.

Plaintiffs also cite the Eleventh Circuit case of Garrido v. Dudek as a recent model for how this Court might fashion injunctive relief in the present case.  731 F.3d 1152 (11th Cir. 2013).  In Garrido, plaintiffs were minors diagnosed with autism or autism spectrum disorders suing the State of Florida for access to applied behavioral analysis ("ABA") therapy under Medicaid.  Garrido, 731 F.3d at 1155.  After finding that the plaintiffs were entitled to receive ABA therapy, the Eleventh Circuit upheld and modified the district court's injunction ordering the State of Florida to "provide, fund, and authorize Applied Behavioral Analysis treatment to Plaintiffs" and "take whatever additional steps are necessary for the immediate and orderly administration of ABA treatment to Plaintiffs[.]"  Id. at 1160.

There are several factual differences between Garrido and the present case that undermine the Court's confidence in relying on Garrido.  For one, this case is still in the summary judgment phase.  The district court in Garrido only issued its injunction only after denying summary judgment to both parties and conducting a bench trial.  Id. at 1156.

Also, Garrido concerned a particular Florida state regulation that excluded ABA therapy from Medicaid coverage.  Id. at 1155–56.  Accordingly, the Eleventh Circuit upheld the part of the injunction that struck down the regulation in question.  Id. at 1160.  Here, there is no such state regulation excluding ICF/ORC therapy from Medicaid coverage.  In fact, it is undisputed that DPW already authorizes and funds ICF/ORC therapy at two state-licensed facilities.  (Pls.' Mot. Summ. J., Ex. 41, Def.'s Objections and Resp. to Pls.' Sec. Set of Interrog. ¶ 2.)

Moreover, in the present case, while not making ICF/ORC services available to the Plaintiffs, DPW has been responsive to Plaintiffs' concerns.  Plaintiffs initially commenced this

litigation after DPW had announced that it would cap the amount of authorized Community

Integration therapy at twelve hours per week, effective January 1, 2012.  (Compl. ¶¶ 3, 50.)  After

Plaintiffs filed their Complaint, not only did DPW respond by postponing the enactment of its

changes to the OBRA Waiver, it also changed its decision about Community Integration therapy

and raised the cap for Community Integration therapy from twelve to twenty-one hours per week.

(Pls.' Mot. Summ. J., Ex. 10, Dep. of Virginia Dawn Rogers ("Rogers Dep."), Jul. 10, 2013,

87:10–88:2.)  Moreover, when Plaintiffs inquired about the steps necessary to found and operate

a new, state-licensed ICF/ORC facility, DPW provided Plaintiffs, through their counsel, a list of

the steps a provider would have to take to develop a new ICF/ORC facility and a list of DPW

contacts for licensing and budget questions.  (Def.'s Mot. Summ. J., Ex. 15, Wolson-Darr E-mail

Correspondence.)  There is nothing in the record of Garrido to reflect that the State of Florida

was similarly responsive to the plaintiffs' concerns in that case.  Garrido, 731 F.3d at 1155–56;

K.G. ex rel. Garrido v. Dudek, 864 F. Supp. 2d 1314, 1316–20 (S.D. Fla. 2012).  For all of the

differences between the facts of Garrido and the present case, the Court declines to apply the

Eleventh Circuit's analysis in Garrido to the present case.

      As discussed above, the new definition of "medical assistance" under 42 U.S.C. §

1396d(a) and its legislative history is clear enough that DPW must do more to ensure that

Plaintiffs receive the services to which they are entitled, yet not clear enough to inform this Court

what steps DPW is required to take under the law.  In light of that uncertainty, the Court cannot

presently "describe in reasonable detail— and not by referring to the complaint or other

document— the act or acts restrained or required" of DPW in this case.  Fed. R. Civ. P.

65(d)(1)(c).

Additionally, given DPW's responsiveness to Plaintiffs' concerns about their benefits, the Court is confident that the parties can either craft a solution via settlement or present the Court with clearer options to consider should this case proceed to trial.  As such, the Court cannot issue an injunction based on the pending Motions for Summary Judgment because disputes of material fact exist as to whether "the 'balance of equities' favors granting injunctive relief."  Chao, 327 F.3d at 228.

Accordingly, the Court will deny both Plaintiffs' and DPW's Motions for Summary Judgment as to injunctive relief.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment as to declaratory relief and deny the remainder of Defendant's Motion against Plaintiffs, and grant Plaintiffs' Motion for Summary Judgment against Defendant as to liability, but deny Plaintiff's Motion as to declaratory and injunctive relief.

An appropriate order follows.

23