IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIMBERLY HOFFMAN, by and through her parents and next friends, CLAIRE AND STEPHEN HOFFMAN | : : : : : | CIVIL ACTION |
| | : | NO. 11-7418 |
| v. | : : | |
| DEPARTMENT OF HUMAN SERVICES OF THE COMMONWEALTH OF PENNSYLVANIA, et al. | : : : : | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bartle, J.                                    January 9, 2024

        Plaintiff Kimberly Hoffman, by and through her parents
and next friends, Claire and Stephen Hoffman, as well as a
number of other plaintiffs, brought this putative class action
on December 1, 2011 against the Pennsylvania Department of
Public Welfare ("DPW") and Gary Alexander, in his official
capacity as Secretary of Public Welfare.[1]  With the passage of
time, the name of the DPW has changed to the Pennsylvania
Department of Human Services ("DHS") and the Secretary of Human
Services is now Valerie Arkoosh.  The plaintiffs alleged that
the DHS's 2011 amendments to the Omnibus Budget Reconciliation
Act waiver ("OBRA waiver") program would terminate or
substantially reduce the services to which they were entitled in

---

1.  While plaintiffs initially moved for class certification,
that motion was promptly withdrawn and plaintiffs proceeded on
an individual basis (Doc. # 26).

violation of Title XIX of the Social Security Act, 42 U.S.C. § 1396.  They sought declaratory and injunctive relief.

The Hoffmans reached a settlement with what is now DHS on December 18, 2014.[2]  On January 5, 2015, my colleague Judge Ronald L. Buckwalter dismissed the action with prejudice (Doc. # 73).  However, pursuant to his order, the court retained jurisdiction over the action for the purposes of interpreting and enforcing the settlement agreement.  Before the court is the April 20, 2023 motion of defendants to terminate the settlement agreement on the ground of the Hoffmans' breach due to lack of cooperation and on the ground of impossibility of performance (Doc. # 211).  Over eight years have intervened since the signing of the settlement agreement and the filing of the pending motion.

I

According to the amended complaint, which was filed on June 6, 2012, the several plaintiffs were individuals with autism and thus were eligible for habilitation services in small intermediate care facilities as persons with other related conditions ("ICF/ORC").  Plaintiff Kimberly Hoffman has

---

2.  The remaining plaintiffs also settled with defendants on or about this time.  The details of these settlements are not known because these parties have not publicly filed their agreements with the court and have never sought to have this court enforce them.

pervasive developmental disorder not otherwise specified (an autism spectrum disorder) and bipolar disorder.

In March 2012, Kimberly Hoffman's parents sought services for her via an ICF/ORC.  However, while ICF/ORCs are officially available in Pennsylvania, only two such facilities existed in the Commonwealth as of June 2012, and each served only seven individuals.  Thus DHS did not have any residential placements available for Kimberly Hoffman.  The Hoffmans alleged she was denied the opportunity to access services via an ICF/ORC and instead was required to choose between greatly limited OBRA waiver services and institutionalization in a nursing facility.

II

The settlement agreement was executed December 18, 2014 by DHS, OLTL of DHS, and the Hoffmans.  The agreement states that "DHS will take the actions required by the Medicaid Act, U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(A), and 1396d(a), to the extent those statutory provisions are applicable, so that [Kimberly Hoffman] receives appropriate, 24-hour OBRA waiver-funded services in a one-person residence."  Settlement Agreement at III.1.

DHS is specifically required under the settlement agreement to "identify and reach agreement with a provider acceptable to Plaintiff and Parents to provide to Plaintiff in a one-person residence [with] Residential Habilitation services

3

that DHS accepts as medically necessary for Plaintiff."  Id. at

III.2.  The Hoffmans, for their part, are obligated to

"cooperate with DHS and potential Residential Habilitation

providers during the process of identifying, procuring, and

reaching agreement on an acceptable Residential Habilitation

provider [and] will not unreasonably withhold their approval of

a Residential Habilitation provider."  Id. at III.2.c.

        The settlement agreement further states that if,

within forty-five days after DHS has reached agreement with a

service provider to serve Kimberly Hoffman, such

> provider has not developed the Residential
> Habilitation program, including securing
> appropriate housing, hiring and training
> qualified staff, and procuring the necessary
> equipment, furnishings, supplies and
> services necessary to maintain a residential
> program and provide services to Plaintiff in
> accordance with her ISP, then OLTL will,
> within thirty (30) days, identify and reach
> agreement with another provider that is
> qualified to provide Residential
> Habilitation services under any DHS home and
> community-based waiver and that has
> experience in serving people with Autism
> Spectrum Disorder.

Id. at III.2.e.  The agreement then requires that such provider

"will select reasonable housing where [Kimberly Hoffman] will

receive Residential Habilitation services[.]"  Id. at III.2.g.

In addition, "the provider must assure that the selected housing

is located within Montgomery County or Chester County and within

a radius of 10 miles of [the Hoffmans'] current home in Royersford, Pennsylvania." Id.

At the heart of the settlement agreement is the assumption that an acceptable service provider existed out there willing and able to provide the above described services for Kimberly Hoffman.

III

Kimberly Hoffman has never received 24-hour care under the settlement agreement.  Since the execution of a settlement agreement in December 2014, the parties have been unable to agree with respect to the implementation of paragraphs III.2, III.2.b, c, e, and g of the settlement agreement.

On June 2, 2015, approximately six months after the Hoffmans reached a settlement with DHS, the Hoffmans filed a motion to schedule a status conference and contempt hearing due to the failure of DHS to enter into an agreement with any provider to supply residential habilitation services to Kimberly Hoffman (Doc. # 82).  No ruling was made on the motion. Instead, Judge Buckwalter held regular status conferences with the parties in an attempt to resolve the issue.

On December 23, 2015, after approximately six months of status conferences, the Hoffmans filed a second motion to hold DHS in contempt due to DHS's failure to provide services to

Kimberly Hoffman (Doc. # 90).[3]  Judge Buckwalter held an initial
status conference to discuss this pending motion on January 12,
2016.  Shortly thereafter he retired, and the action was
reassigned to the undersigned on January 26, 2016.  On March 2,
2016, the undersigned referred the case to Magistrate Judge
Jacob P. Hart for a settlement conference.  Judge Hart held
approximately ten sessions with the parties without any success.

On July 7, 2016 the Hoffmans filed another motion for
a hearing regarding breach of the settlement agreement because
of DHS's failure to provide a residence to Kimberly Hoffman
(Doc. # 109).  On July 20 and 21, 2016, the court held a hearing
on this motion.  Rather than decide the motion, the court, with
the concurrence of the parties, held approximately twenty status
conferences over the next year in an attempt to iron out the
outstanding issue.  A supplemental hearing was scheduled for
August 2017, which was later postponed, again to facilitate an
amicable resolution.

On August 13, 2017, DHS contracted with Step-by-Step,
Inc. to provide services to Kimberly Hoffman in a one-person
residence known as the Shady Lane house.  The parties also
amended the settlement agreement on or about that date to add an

---

3.   On April 26, 2018, after extended discussions with the
parties, the court granted the Hoffmans' request to withdraw
this motion (Doc. # 156).

additional term which is not relevant to the pending motion.[4]
Despite the contract with Step-by-Step, the Hoffmans filed a
renewed motion on September 25, 2017 for a hearing regarding
DHS's failure to provide proper services to Kimberly Hoffman
(Doc. # 143).  The court scheduled a hearing for December 7,
2017.  The hearing was then postponed with the agreement of the
parties.  On April 25, 2018, the Hoffmans moved to dismiss any
and all currently pending motions.  The court granted this
motion on April 26, 2018.  The motion to hold DHS in contempt
(Doc. # 90) and the motion for a hearing regarding breach of the
settlement (Doc. # 109) were dismissed pursuant to Rule 41(a) of
the Federal Rules of Civil Procedure (Doc. # 156).

        On December 18, 2020, the Hoffmans filed yet another
motion to enforce the settlement agreement so that Kimberly
Hoffman would receive residential habilitation services (Doc.
# 158).  Step-by-Step, which had been Kimberly Hoffman's
provider until that point, had ceased to provide services due to
difficulties staffing the Shady Lane house.  This motion was
ultimately withdrawn without prejudice on September 14, 2023

---

4.   This amendment added that the settlement agreement "shall
not be construed to prevent Kimberly Hoffman, her heirs,
successors or assigns, or anyone acting in her interest, from
asserting any claims against any provider of services to
Kimberly."  All other terms and conditions remain the same.  The
parties did not publicly file the amended settlement agreement
until April 25, 2018 (Doc. # 155-1).

pending resolution of the instant motion of DHS filed on April
20, 2023 (Doc. # 236).

On January 19, 2023, John K. Greiner, Esq., long-time
counsel for the Hoffmans, moved to withdraw his appearance (Doc.
# 198).  After a court hearing, the court granted the motion
without objection from the Hoffmans.  Matters were at a
standstill for several months until the Hoffmans obtained new
counsel, Matthew B. Weisberg, Esq., who entered his appearance
on March 28, 2023.

Throughout the years after December 2014, the court
held regular status conferences to help effect a solution to the
outstanding issues between the parties related to the settlement
agreement.  In total, approximately sixty status conferences
were conducted by Judge Buckwalter, Magistrate Judge Hart, and
the undersigned.  Of these status conferences, the undersigned
alone presided over two-thirds of them.  The inherent
difficulties throughout related to the problems of finding,
working out an agreement with, and resolving disputes with an
acceptable third-party provider – matters not in the ultimate
control of the parties or the court.  Regrettably, these
difficulties proved insurmountable.

Defendants, as noted, moved to terminate the
settlement agreement on April 20, 2023 (Doc. # 211) because in
their view the Hoffmans have failed to cooperate and thus

breached the agreement and because of the impossibility of
performance.  An evidentiary hearing on this motion, rescheduled
at the request of parties, was ultimately held on September 20
and 21, 2023 after a period of discovery.  Witnesses for the
defendants as well as Claire Hoffman, the mother of Kimberly
Hoffman, testified.  Briefs were filed after the hearing.  The
court now makes its findings of fact and conclusions of law on
the pending motion.

IV

As previously recounted, DHS, with the approval of the
Hoffmans, reached agreement with Step-by-Step on or about August
13, 2017 to serve as Kimberly Hoffman's service provider
pursuant to the settlement agreement.  Settlement Agreement at
III.2.  This organization owned the Shady Lane house where it
provided services for Kimberly Hoffman as the only resident.  At
most, Step-by-Step provided services from Monday through Friday
between 9:00 AM and 3:00 PM, and not full-time, 24-hour care as
contemplated by the settlement agreement.  The provider had
persistent difficulty hiring staff to work at the home with
Kimberly Hoffman due to the labor market, the unique nature of
the placement, and Kimberly Hoffman's requirements.  On or about
October 2019, Vena Guzman was hired by Step-by-Step to be the
program director of the Shady Lane house.  She started work in
January 2020.  However, staffing issues persisted and the

relationship with Step-by-Step and the Hoffmans deteriorated. Step-by-Step ended its relationship with the Hoffmans in early March 2020 but agreed to continue providing services for a limited period.  When these interim services lapsed, Kimberly Hoffman was permitted continued access to the house, which is still owned by Step-by-Step and is leased to Kimberly Hoffman for a nominal fee.

Once Step-by-Step terminated services, DHS and the Hoffmans promptly started searching for new service providers. DHS provided the Hoffmans with a list of providers to consider and reached out to providers that the Hoffmans identified. First Sharon Tomforde, and then Randolph Nolen, served as point persons for the Hoffmans at DHS.  In that role, Ms. Tomforde and then Mr. Nolen regularly monitored a list of residential habilitation providers active in the relevant geographic area that had been compiled by the OLTL and the Office of Developmental Programs of DHS ("ODP").  As point persons, they regularly reached out to organizations on this list and engaged in extended discussions with residential habilitation providers in order to understand their capacity and interest level.

In December 2021, Supportive Concepts for Families, Inc. expressed interest in serving as Kimberly Hoffman's residential habilitation provider.  In May 2022, DHS and Supportive Concepts discussed the pay structure.  On August 10,

10

2022, the CEO of Supportive Concepts met with Kimberly Hoffman and the two discussed expectations of the services that would be provided and the potential staff members that could render such services.  The following day, Kimberly Hoffman accepted Supportive Concepts as her provider.  While the Hoffmans initially agreed to have Supportive Concepts serve as Kimberly Hoffman's provider, no agreement was ever signed, and it never rendered any services.

Later in August, the Hoffmans began to express concerns regarding Supportive Concepts' plan for the ownership of the Shady Lane house.  Supportive Concepts proposed that the house would be purchased by Fortis Holdings, a for-profit entity affiliated with Supportive Concepts.  However, the Hoffmans disagreed and wanted the home to be owned outright by Supportive Concepts because of its nonprofit status.  Over the next few months, DHS and Supportive Concepts negotiated and drafted an agreement regarding the ownership of the Shady Lane house at the request of the Hoffmans.  This agreement included contingency plans should Supportive Concepts no longer be Kimberly Hoffman's service provider.  No agreement was ever signed.

Ultimately, on January 10, 2023, the Hoffmans rejected Supportive Concepts as the service provider for Kimberly Hoffman.  As noted, it never provided services for Kimberly Hoffman at the Shady Lane house.  The Hoffmans made this

11

decision because Supportive Concepts had been unable to find
adequate staffing and because Kimberly Hoffman had lost trust in
Supportive Concepts as a partner due to the lack of direct
communication with her after their initial conversation on
August 10, 2022.

V

DHS, despite good-faith efforts, has been unable to
identify a service provider that is both willing and able to
accept Kimberly Hoffman's case and that is also acceptable to
the Hoffmans.  A number of providers which were initially
interested have been rejected by the Hoffmans.  In addition,
providers that the Hoffmans ask DHS to pursue have declined the
opportunity to enter into any agreement.

From late 2020 to 2021, for example, during which time
Kimberly Hoffman did not have a residential habilitation service
provider, DHS engaged in outreach to find willing partners.  To
identify such providers, Mr. Nolen of DHS sent out two e-mail
"blasts" to all residential habilitation service providers
registered with the OLTL and ODP.  This was a preliminary step,
and Mr. Nolen engaged in further follow-up based on the
providers' responses.

In early 2021, most available service providers that
responded to Mr. Nolen's inquiry were unable or uninterested in
serving Kimberly Hoffman at the Shady Lane house.  Many

12

providers were not interested due to the one-person service
provision model or the location of the Shady Lane house or
because they only supply services to individuals with traumatic
brain injury.  Of these providers, only two replied
affirmatively and requested additional information.  Of those
two, Mr. Nolen timely notified the Hoffmans regarding Loving
Heart Behavior and its interest.[5]  The Hoffmans rejected Loving
Heart after reviewing the provider's website.

On October 14, 2021, after a lengthy review of the
providers initially interested, Mr. Nolen reached out to
additional potential providers.  He received many of the same
concerns.  Additionally, providers that were interested had
issues regarding the responsibilities involved with ownership
and oversight of the Shady Lane house.  After this "blast," Mr.
Nolen referred to the Hoffmans two providers who had not
previously been reviewed: Samaritans at Last and Keystone Center
for Family Development.  Mr. Nolen, for example, also suggested
the Hoffmans reach out to Emmaus House, a provider which
expressed interest in working with the Hoffmans.  The Hoffmans
rejected this provider due to its faith-based service delivery.
While the Hoffmans did not explicitly accept or reject the two

---

5.    The other provider was not further discussed in e-mails or
during testimony at the evidentiary hearing.

new providers, Mr. Hoffman questioned the sufficiency of the
options that DHS had identified thus far.

VI

The parties do not dispute that Pennsylvania contract
law applies to the pending motion to terminate the settlement
agreement.  Defendants, as noted, first contend that the
Hoffmans have breached the agreement because of their
unreasonable refusal to cooperate in the selection of a provider
for Kimberly Hoffman.  The defendants further contend that even
if the Hoffmans were cooperative, the settlement agreement
should be terminated due to impossibility of performance.

Assuming, but without deciding, that the Hoffmans have
not materially breached the settlement agreement, the court
first turns to the question of whether performance under the
contract is impossible.  In Pennsylvania, impossibility "means
not only strict impossibility but impracticability because of
extreme and unreasonable difficulty, expense, or loss involved."
Albert M. Greenfield & Co., Inc. v. Kolea, 380 A.2d 758, 759
(Pa. 1977) (citing West v. Peoples First Nat'l Bank & Tr. Co.,
106 A.2d 427, 432 (Pa. 1954)).  Pennsylvania has adopted the
Restatement (Second) of Contracts § 261, which reads:

> Where, after a contract is made, a party's
> performance is made impracticable without
> his fault by the occurrence of an event the
> non-occurrence of which was a basic
> assumption on which the contract was made,

14

> his duty to render that performance is
> discharged, unless the language or the
> circumstances indicate the contrary.

See, e.g., 9795 Perry Hgwy. Mgmt., LLC v. Bernard, 273 A.3d
1098, 1104 (Pa. Super. 2022) (quoting Restatement (Second) of
Contracts § 261 (1981)).

It is important to emphasize that DHS itself was never
to provide services to Kimberly Hoffman under the settlement
agreement.  Rather, it was tasked with identifying and
contracting with a third party that was willing and able to do
so.  DHS cannot compel any provider to provide services.  As
explained previously, it was a basic assumption of all parties
to the settlement agreement that there were satisfactory service
providers in the community.  Not any possible provider would do.
The terms of the settlement agreement were quite specific.  The
provider must be one which "has experience in serving people
with Autism Spectrum Disorder," to say nothing of having to
provide 24-hour services in a one-person residence within a
narrow geographic area.  In drafting the settlement agreement,
the parties provided aggressive deadlines for DHS to identify
and recommend service providers for the Hoffmans.  This confirms
that all parties believed such providers to be ready and able to
accept this responsibility.  The assumption of the parties
turned out not to be well-founded.

15

Step-by-Step and Supportive Concepts have both attempted to provide such services without success as contemplated by the settlement agreement.  DHS has done everything it can reasonably do to identify providers and to bring them on board.  Even assuming that the Hoffmans fulfilled their commitment of cooperation, their conduct has not made it easy for DHS.

This case is similar to Litman v. Peoples Natural Gas Co., 449 A.2d 720 (Pa. Super. 1982).  There, Eugene Litman purchased sixty acres of farmland, upon which he built an apartment complex.  Id. at 722.  He requested Peoples Natural Gas to provide gas service to the building.  Id.  However, Peoples notified him that the company would be unable to provide such service due to the Public Utility Commission's ban on entering new contracts to supply gas in that instance.  Id.  The Superior Court affirmed the trial court's decision directing a verdict based on Peoples' defense of impossibility of performance.  Id. at 725.  Although the contract with Peoples gave Litman certain rights to gas service, the regulations of the PUC, a third party not under the control of either litigant, made such performance impossible.  Therefore, Peoples was excused from performance.

Neither DHS nor the Hoffmans can force a service provider to undertake the care of Kimberly Hoffman.  It is clear

that after more than eight years of continued effort by DHS and the Hoffmans to find acceptable providers, none has been found or is likely to be found that meets the stringent demands of the settlement agreement.  A promise to contract with a third party to provide services to Kimberly Hoffman is rendered useless if no qualified organization will supply such services.  Requiring DHS to continue to reach out to providers, let alone with the hope of pleasing the Hoffmans, would be a futile exercise. Performance, without fault of any party, is impracticable.  See Specialty Tires of Am., Inc. v. CIT Grp./Equip. Fin., Inc., 82 F. Supp. 2d 434, 437 (W.D. Pa. 2000).

                              VII

        The parties undoubtedly acted with good intentions and in good faith when they signed the settlement agreement in December of 2014 and agreed to the dismissal of the action with prejudice.  Nonetheless, the court cannot ignore what has happened and not happened for close to a decade thereafter.  The court must not turn a blind eye to reality.  DHS especially did all that could reasonably be expected of it to make a go of the settlement agreement.  The implementation of the agreement, as all parties always knew, depended on third parties over which neither the DHS nor the Hoffmans had any sway.

        The December 18, 2014 settlement agreement will be terminated as impracticable of fulfillment without fault of any

                              17

party.[6]  Accordingly, all parties will be discharged from performance.

The court does not come to its decision lightly or precipitously, but only after an evidentiary hearing and the many years of concerted but fruitless efforts by all concerned to make the settlement agreement work.  Nothing in the court's analysis or decision should be construed to prevent Kimberly Hoffman from now applying for and receiving whatever assistance or benefits may be available to her under federal or state law.

---

6.  As a result, the court need not reach the issue as to whether the Hoffmans have breached the settlement agreement for failure to cooperate with DHS.

18